So our next case is No Mid-Currituck Bridge v. North Carolina Department of Transportation. Ms. Hunter, whenever you're ready. Thank you, Your Honor. May it please the Court, I'm Kim Hunter with the Southern Environmental Law Center representing the plaintiffs, and I have Nick Torrey and Hannah Nelson with me at counsel table. Your Honor, the central issue before this Court is this. If the government does not provide the public with relevant information at a meaningful time, then the National Environmental Policy Act cannot perform its role as a democratic decision-making tool. In this case, the transportation agencies failed to provide the public with relevant information about the Mid-Currituck Bridge in two distinct ways, both of which stand in sharp contrast to what this Court has long made clear that NEPA requires. First, the transportation agencies failed to provide the public with over seven years of new information about traffic forecasts, population growth, project costs, and sea level rise. And all of these issues have significant implications for a decision about whether a destructive five-mile, $600 million bridge is the best transportation solution for a barrier island on North Carolina's Outer Banks. Second, in a direct rebuke to this Court's prior precedent, the transportation agencies failed to disclose the indirect impacts the bridge would have on the natural resources of the Outer Banks. And this failure came about because the agencies relied on population and traffic data that assumed the bridge would be constructed to create the baseline condition. This is an error that these same agencies have made multiple times before and one that has been squarely rejected by this Court. Both of these errors are independent violations of NEPA, and either of which is sufficient to invalidate the record of decision here. This Court should vacate the record of decision, and if the transportation agencies wish to proceed with this bridge, they should be required to prepare an up-to-date supplemental environmental impact statement for full public review that accurately discloses the impacts of the bridge and its relative merit with regard to other alternative solutions. And I can discuss each of these claims in turn, Your Honors. So with regard to the seven years of information which was not provided to the public, CEQ regulations require that, quote, when there are significant new circumstances or information that are relevant to environmental concerns and have a bearing on the proposed action or its impacts, a supplemental EIS must be required. So what do you say that the agency should have done that they didn't do here? Could you repeat the question, Your Honor? What do you say the agency should have done that it did not do here? Yes, Your Honor. I would say there are three main things. First of all, the agency should have taken a hard look at that significant information, and in certain circumstances it did take a hard look at traffic forecasts, for example. But in other circumstances like sea level rise, the agency didn't even do that first step that this court of the test this court has articulated and used. Are you talking about the information that your client sent them or something else? Both, Your Honor. The agency has a responsibility to look at information we sent them, but they also have a responsibility just to look at relevant information. For example, if you're building a bridge to a coastal barrier island, you have a responsibility to look at sea level rise data. So that was the first area. They did look at sea level rise. The agencies looked at some, they looked in their reevaluation, they looked at some still slightly outdated sea level rise data, but they did not look at the most up-to-date sea level rise data that had been put out into the public by the Federal Highway Assistance Agency, NOAA. But I would say more importantly than that, this isn't really a question of The agency says a lot of that data wasn't really specific to this location and that it was sort of generalized worldwide data. Well, in fact, what the agency didn't look at was that more specific. They looked at some generalized data, but I would make the point that this question of which particular sea level rise data they looked at is really beside the point. That is an error, but the more fundamental Why is it beside the point, though? I mean, if you're sending them sea level rise levels off the coast of India, how is that relevant to sea level rise on the barrier islands of North Carolina? It wouldn't be on it. And the sea level rise data that they failed to look at was specific to Duck, North Carolina. But regardless of that particular question, I think Wait a minute. So tell us exactly where we're going to find in the record that particular piece of information. Yes, Your Honor. The fourth assessment sea level rise data is referenced in the record at JA01945. And the Duck projections, which we referenced, are in the record at JA03677. But if I could make the more fundamental point here, Your Honor, it's not a question of did they look at precisely the right sea level rise data. The question is did they ever actually analyze how sea level rise would affect this bridge and did they disclose that information to the public? Because the last time the agencies performed the mandated public review of the Midkirtik Bridge was in 2012. And at that time, sea level rise was not as much of a problem as we know it is today. And when the agencies did that public analysis, what they disclosed was there'll be at most 26 inches of sea level rise, but we don't need to worry about it because the bridge will be long past its usable lifetime then. And so, you know, we're just not going to be concerned about this. Why doesn't that make sense? That made sense in 2012. What's happened since then is the projections of sea level rise have increased significantly. And so now you have a level of sea level rise. Well, but the agency, as I understand the record, indicated that these new forecasts that I think you're talking about were within the range originally considered. So is that incorrect as a matter of fact? It's incorrect as a matter of fact. And it's also incorrect because the period of the usable lifetime of the bridge has changed over time. So what they looked at in 2012, they said, well, even though we're sort of going to take this cursory look at 26 inches, we're not going to really analyze it because the bridge won't be usable by then. But now when we're going to see a much higher level of sea level rise a lot earlier, which is actually going to inundate roads going to the bridge, that information about that level of sea level rise is much more relevant. And that is there is nowhere in the record is there any public review that has been presented to the public prior to this decision being made, which gets to that question of if the sea levels rise and these roads start to be inundated, is this bridge still the best transportation solution for the Outer Banks? And that is the question. Maybe I'm wrong about this, but I thought the agency concluded that with a rise in sea level, that made the bridge all the more important because it was the one secure location by which you could exit the Outer Banks. I wouldn't say, Your Honor, that the agencies concluded that. They did put a throwaway line in their final EIS. But this bridge, as the only causeway off the Outer Banks, has never been a purpose for this bridge. And when you're analyzing LEPA... If I was on the Outer Banks and the sea level was going up and I needed to get off, I'd think that would be pretty important. Absolutely, Your Honor. And if the agencies want to design a bridge for that purpose, they can establish a purpose and need, which is sea levels are rising, we need a way off this island, what's the best way? And then they can analyze solutions, present that to the public, and that would follow what NEPA requires. But that's not what they did here. It was never a purpose of this bridge to be the only causeway off the Outer Banks. Can I ask you a question sort of backing up a little bit? The sea level rise and the changes in the traffic data, they don't affect the environmental impact of building the bridge, right? And the district court thought it doesn't affect the impact of the bridge itself, then there's no need for a supplemental impact statement. And you say that's wrong, obviously. But, I mean, I'm looking at the regulations for the Highway Administration, and they do seem to say that, that you have to do one when there's new information relevant to environmental concerns bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS. So you're under relevant to environmental concerns. That's right, Your Honor. And it's relevant to environmental concerns whether you build a destructive bridge or you upgrade existing roads. And so if that's still a question seven years later and there are new circumstances. So your premise is anything that might change sort of the balance and make the agency pick something that is less environmentally damaging is going to be covered. That's right, Your Honor. Is there any limiting principle there? Because that seems like there'll never be a final environmental impact statement if that's the standard. Yes, Your Honor. Well, first of all, I think as the Supreme Court said in Marsh, it has to be information that is helpful to the decision-making process. Marsh was a case, right, where it was a direct environmental impact. It was, but there's a longer discussion in Marsh about sort of general NEPA principles and why we continue this analysis throughout the process because NEPA is this action-forcing device which helps the government make these better decisions. What is the limiting principle, though, in Judge Harris's question? Because when you have a delay, and here the delay arguably is getting close to 50 years, every year that goes by the economy is going to change, other things are going to change. And I thought I read several places in the district court's opinions where the plaintiffs had conceded that there was no change in the environmental impact with respect to the bridge, but that your arguments went more to financial aspects and that sort of thing, not environmental matters. Well, Your Honor, if I can answer the limiting principle first, I think one big limiting principle here is a decision had not yet been made. So this isn't a situation where a final decision's been made. And also the agencies were already triggered to do this re-evaluation, which they're required to do internally if three years have passed. So there are limiting principles in place, and the question is, when they did that re-evaluation, which they were required to do by law, were they correct in concluding that nothing was significant? I'm sorry, I got tripped up in reading this regulation, but I'm sort of focused on this. It does seem as though the Highway Administration regulation requires a supplemental impact statement only when this new information bearing on the proposed action would result in significant environmental impacts not evaluated in the EIS. Do you read the regulation differently, or are you challenging the regulation? No, we're relying on CEQ's regulation, which is 40 CFR 1502.9. What do I do with the Highway Administration's regulation? Well, Federal Highways is bound by the CEQ regulations by the Andrus case. So if I'm reading this correctly, it's wrong? Well, it has to be read to be consistent with CEQ's regulation. Okay, so your bottom line is this is wrong? And several courts have required supplemental EISs in the case where the alternatives analysis is… I'm just trying to figure that out as a matter of ad law. It does seem to me that in order to come out your way on this point, we would have to be saying this regulation is wrong. Well, and the CEQ regulations are supreme, your Honor, yes. With regard to the question of… I'll give you a little extra time because I know we've asked a lot of questions, but go over again exactly why the CEQ regulation overrides this regulation. How is it inconsistent? Well, your Honor, the CEQ regulation, I think, is just a little bit broader about when a supplemental EIS is required and the Federal Highways regulation maybe has an extra clause, but I think they can be read… So what exactly does that… I don't have it in front of me. What exactly does that regulation say that bolsters your argument here? The CEQ regulation, and this is the regulation which the Supreme Court has interpreted in Marsh and this court recently interpreted in Save Our Sound, says if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. So the point is the information relevant to environmental concerns. And so that's not… There can be a whole variety of things which are relevant to environmental concerns, and I think more broadly all these regulations have to be read to be consistent with the NEPA statute, and what the NEPA statute says is that NEPA is an action-forcing mechanism which requires both the government and the public to get information at a meaningful time. So in the scheme of NEPA, it wouldn't make any sense to only look at the environmental impacts of a decision you had already made if you hadn't made that decision yet, because the whole point of NEPA is to disclose all that information so you can have a meaningful decision-making process. So you've said a number of times that there was a failure to disclose. In the other North Carolina transportation case, it was obvious that the agency entered into a course of conduct to hide information. I haven't seen that here. Are you saying that they intentionally misled the public? I wouldn't go so far as saying they intentionally misled the public in the same way that they did in the North Carolina Wildlife Federation case, but they certainly say time and time and time again in their FEIS there will be no reasonable foreseeable impact on the natural resources of the Outer Banks. And we've cited that many times in our brief. And then they say in this sort of backwards way, well, here's the baseline, and then if you build the bridge, there'll be no difference. But if you don't build the bridge, there'll be less development, and you have to kind of dig in to get there. And what the agency should be doing is just saying, if we build the bridge, there'll be this much additional development. And then the key piece is, what impact will that development have on natural resources? And that's the place where the agency's failed here. They just simply didn't do the analysis of what does that additional growth mean for environmental resources. So it's a little bit, slightly different, but analogous. Can I ask a question? Sure. I just had, this sort of, I think, ties together your two arguments, and there's a thing that I am finding just hard to get my hands around. Your theory for why this is sort of environmentally relevant over on the supplemental impact statement, is that, look, anything that would tip the balance and get you something that is much less environmentally damaging is relevant. But it does seem to me that in this case, it's not like the original environmental impact statement said, this bridge will be very damaging, but we have to do it anyway. It's just so necessary because of the congestion that we have to kind of swallow this very severe environmental impact. As you say, it actually said, there aren't going to be any significant environmental impacts with this bridge. And it seemed like it was kind of a draw, at least as between the bridge and the existing roads. And so in light of all of that, this isn't the kind of case where you could say, look, any small change in the benefits and necessity for the project might have flipped the agency over to something substantially less environmentally damaging because the agency doesn't think this bridge will be environmentally damaging. Can I make two quick points, Joanna? I think first, there is a distinction between direct environmental impacts and indirect environmental impacts. They didn't disclose the indirect, but they certainly disclosed that building a seven-mile structure across what is currently a very tranquil sound would have a lot of impact, particularly on duck hunting habitat and waterfowl habitat. I mean, it's a huge structure. No, I understand it's not going to have, but compared to the no-build alternative, it will be more damaging. But this was not the kind of case where the agency says, oh, yes, we're going to lose an entire species, but we have to do it. There's no other way to get people out if there's a hurricane. And then it turns out, oh, we found another way to get people out. Sure, Your Honor. So my second point is that NEPA isn't just about persuading the agency what alternative, you know, that it has to make the least environmentally damaging alternative. It's not about that at all. It's a procedural statute. It's about public disclosure. And what parties like my clients can do with a NEPA document, if it is accurate, is take that and advocate to their local elected officials, to permitting agencies, to the legislature. But if the information they have is outdated or inaccurate, and they've got a picture of the bridge where, well, this other alternative simply won't work because there's too much traffic and population growth is coming too much and the funding only works this way, then they're stymied in their ability to advocate. And that's precisely the purpose of NEPA, is to give this accurate representation of all these different alternatives so that they can then make those arguments in a variety of public spheres. And I'll reserve the remainder of my time, Your Honor. All right. Thank you very much. Ms. Ingalls. Good morning, and may it please the Court. I'm Summer Ingalls for the Federal Appellees. With me at counsel table is Mr. Colin Justice for the State of North Carolina. I plan to begin today by explaining why the decision not to supplement the EIS was reasonable with reference to the accurate standards, and then I'll turn to the plaintiff's challenge to the agency's no action alternative analysis. The Federal Highways Regulation, the CEQ Regulation, and the relevant case law make clear that supplementation is required only when new information or updated information reflects that there will be a change in the environmental impacts or the concerns and that that change will be significant. Plaintiffs haven't challenged the Federal Highways Regulation, and the Federal Highways Regulation is consistent with the CEQ Regulation and also with the Supreme Court's decision in March, which explained that the preparation of an SEIS is required only when new information will affect the quality of the human environment in a significant manner or to a significant extent not already considered. Ms. Ingalls, I understood your friend on the other side to suggest that because two things. There had been a significant delay in the project, and the fact that the project itself had not yet been approved somehow changed the calculus with respect to the government's obligation to prepare a supplemental EIS. Could you speak to that? No, I can speak to it. I'm aware of no obligation to supplement an EIS simply because time has passed. These projects can take a while, and it's not uncommon for time to pass, and new information can become available during that time period. But the fact that new information is available doesn't render the existing EIS inadequate or require supplementation. Does it matter that the project had not been approved? I don't think that the fact that it had been approved but funding had been poor. You tell me. There was no ROD, or Record of Decision, issued in 2012 when the final EIS was complete. The Record of Decision came after the re-evaluation. The plaintiffs have challenged this as a supplementation issue, and the standards for supplementation are very clear. The fact that the Record of Decision came later did not mean that the agency's supplementation standards had changed, or somehow. Maybe I wasn't following the same wavelength, but I thought what Judge Diaz was asking was, why was the Record of Decision not done within the three-year period with the original EIS? And wasn't that related to some funding change or something of that nature? Yes, and my colleague from North Carolina will better be able to describe the change in funding, but my understanding is that FEIS was completed, the agencies were on track to sign the Record of Decision, but something within the state's funding structure meant that the project had to be shelved for a period of time. And the Federal Highway Administration's regulations are what prompted the agency to take another look at the information because the three years had passed before the ROD was signed. So the Record of Decision was signed after the agencies completed the re-evaluation, determined that none of the updated information would result in significant environmental impacts, and thus that no supplementation was required, and then signed the Record of Decision. I understand your opposing colleague to argue that, as one example, that there was updated sea level rise information that the agency did not consider or did not share with the public, or both. So what's your response to that? Is it relevant, and if not, why not? Well, I disagree with the premise that the agency didn't consider updated sea level rise information. The re-evaluation, I point to pages JA2434-35, 2553-54, 2563, 2575-76. There was a great deal of discussion about this updated sea level rise information. What the agencies ultimately determined was that this information reflected what they already knew from the final environmental impact statement, which was that sea level rise is occurring. It's getting worse. And the fact that the sea levels are rising doesn't implicate the bridge's impacts. If anything, it only reflects the importance of this bridge. Under all of the sea level rise scenarios considered in the FEIS in 2012, the agencies explained that the Outer Banks was likely to be flooded at NC-12 at the Currituck-Dare County lines, and as a result, the bridge would be an important way for people above that break to be able to get off. Also, the FEIS considered not only a range of 2.4 to 23.2 inches of sea level rise, but also a 1 meter scenario, and determined that even in that sort of more extreme scenario, there would be no substantial effect on the bridge's environmental impacts. And again, this just underscores the importance of this project. I am not clear on what the government's position is on what the standard is for when you have to do a supplemental impact statement. Is the district court right that you don't have to do one if the new information doesn't bear directly on the environmental impact of the bridge? Yes. That is correct? I'm sorry, could you restate the statement? I may be saying it wrong. Does a new EIS have to be done if there is new information? It doesn't bear on the impact of the bridge itself, but it bears on the necessity and the benefits of the bridge so that the balance might come out differently. Yes, that is our position based on the regulations. I'm sorry, which is your position, that it does have? That supplementation is required when the environmental impacts are implicated and not the wisdom. So if the state of North Carolina, instead of having a financing package, had approved the bridge, but in their budget it was deficit financed, there was simply a hole, there wasn't enough money in the budgets to complete the bridge and they were going to leave it to the future legislatures to figure that out. If that had transpired, would that have required a reevaluation of the EIS? If there hadn't been adequate funding and the project had been approved but not proceeded with on the ground, that might be one of the consequential steps required under the Federal Highway Administration's regulations for reevaluation. But without additional facts, I'm unable to say whether it would require a supplemental EIS. I think the question would be if during the passage of time, updated information came to light that bore on the project's impacts in a significant sense, then a supplemental EIS would be required. But a reevaluation would be required if there was a lag between implementation and approval. Can I just, I'm sorry, I really wrestled with this, so I just had one last question on this. So I do read the Highway Administration's regulations that way, but the agency in this case, in fact, did consider in its reevaluation study new information bearing on project need and project benefit. It's like a whole separate section. So does the agency understand? Why did the agency do that if it's not necessary? Well, I think part of the reason it was done here is not because it was required by the regulations relevant to supplementation, but because it was required by the regulation requiring a reevaluation if nothing has happened between approval of the project and the ROD. And that's 23 CFR 771.129. And so the reevaluation encompassed more information than was necessary for the supplementation analysis. But ultimately the idea that... I'm sorry, just so I understand, so those are two distinct categories, reevaluation separate from supplementation? They are distinct in the sense that they are dictated by separate statutes, but here what the agency did was in its reevaluation, which is required by the regulatory provision I just cited, it looked at whether supplementation was necessary. And in the course of that analysis, it applied the standards for the supplementation regulation. So was that a NEPA-driven review or a highway statute or regulation-driven review or something else? The reevaluation was completed because of a federal highways-driven review. Plaintiffs assert that some other test applies that has nothing to do with significance of the environmental impacts. They say that if the utility and viability of the bridge has been questioned, then that would require supplementation. Again, the utility is certainly an important element, but it's not important for purposes of NEPA supplementation. And as Judge Harris noted, the agencies looked at whether this project still made sense and determined that they did. I'd reference here, too, the D.C. Circuit's 2017 decision in Friends of the Capitol Crescent Trail. There the D.C. Circuit agreed with the Federal Transit Administration that an SEIS was not required to reconsider the utility of a rail project, even though information had come to light suggesting that the project would actually receive less use than was anticipated in the EIS. And the court applied the standard that I've referenced, looking at significance and environmental impacts, and said that because that standard had not been satisfied, no SEIS was necessary, even though there might be some reason to question whether the project was really as important as it had been when the agency completed the EIS. And the court said even assuming there were some tests that looked at the wisdom, the agency had still satisfied that test because the agency considered data that had come to light about less ridership and decided that it would not ultimately change the selection of this alternative. And that's at 1062. So the court didn't change the relevant test. It applied the proper test and then said even assuming some other tests applied, the agencies had satisfied it. And that's exactly what happened here. Plaintiffs also assert that the combined effect of all of the information that had been updated over time implicates the analysis of the best transportation solution. But again, NEPA does not exist to bring into question the wisdom of the ultimate selection. It's focused specifically on environmental impacts, and that's reflected in the standard. I'd also like to turn to plaintiff's suggestion that the agency's no action alternative analysis didn't accurately disclose the relative differences between the activity that would proceed under the bridge alternative and the no action alternative. And here I draw the court's attention to pages 1321 through 38 and 1546 through 50 in the joint appendix where the court made very clear that there would be more development with the bridge alternative than without the bridge alternative. In fact, there would be a difference of about 2,400 more units with the bridge. And the agencies also identified the effects of that additional development. The opposing counsel argues that that was a consideration that was not evident that the agencies separately did. As best I could understand it, it sort of started at one point and then worked backwards. Yes. And there seems to be some contradictory language at different places about what it considered and didn't consider. Yes. But I take it the point that the opposing counsel has is they should have started with the no build alternative and gone forward instead of starting with the build alternative and working backwards. Correct. But I'm aware of nothing in NEPA or the relevant case law that requires an agency to use a particular approach when identifying the no action alternative baseline. NEPA is concerned with ensuring that the agencies identify relative differences between what will happen if a project proceeds and what will happen if it doesn't. And here the agency said the development baseline is what the project area will look like without constraint. But it was also very clear to say that that baseline would not be met if the project isn't built. And so because the inputs were clear, because the agency explained its rationale and its approach, it's not misleading because the agency not only explained its rationale, but it also figures what the project area would look like on the ground. And the fact that the agency didn't describe development as a direct effect of the bridge was an effort to show that this development was already ongoing. There's demand for it. The area is being built up now without the bridge. So it's ultimately a semantic difference because the record shows that this degree of relative difference was discussed in the FEIS. And it's also quite different from the Monroe Connector case, which was decided on very narrow grounds related to disclosure. There the agency said that the failure to disclose the data's underlying assumptions and false responses to public concerns meant that the agency hadn't taken a hard look at environmental impacts. But here the agency was very clear about its analysis and the fact that it started from the development baseline and worked back from that analysis doesn't mean that the analysis was flawed. I see that I've reached the end of my time. Thank you very much. We ask the Court to affirm. All right. Thank you very much. Ms. Ingalls, Mr. Justice. May it please the Court, my name is Colin Justice. I represent North Carolina Department of Transportation and Secretary Boyette. My colleague did a great job, I think, addressing the standards. I wanted to jump straight to one of the questions that the Court had asked and then I'll be happy to answer any other questions. The reason that the agency started with development forecasts that involved an expectation of a bridge is that FHWA regulations direct agencies to take into account local land use plans. Those are done by the Rural Planning Organization from county and city governments. Their plans for growth are based on expectations of what they expect to need for transportation and schools and zoning and things like that, and those local land use plans assume there would be some additional bridge built. So the transportation agency started with that information as the starting point, then they calculated what the impact of the bridge would be on that growth and subtracted out. That's the reason that it started with forecasts that assumed a bridge is because that is what the local planning organizations were using. The environmental documents make it clear. So your argument is that the Federal Highway Regulations required that particular process? It's one of the things that agencies are supposed to look at. They're supposed to take into account the local land use plans, and they did. Then they made clear in the environmental documents what the difference was in expected growth between the no-build and the build. So the order was driven by the way in which the land use plans were created? That's correct. Is that, I mean, is this particular order unusual or does it vary from jurisdiction to jurisdiction? I think it's commonly used because that's the way the purposes for planning are a little different. The local land use plans are planning for a broader variety of needs than just the project that these transportation agencies are looking at. So they used a different starting point, but that's very relevant information for the transportation agencies planning for the transportation needs. So as I said, those were all disclosed to the public. The traffic forecasts were updated in the 2019 re-evaluation. The agencies also updated, took another look at sea level rise, updated financing information, and they looked at whether there were any updates to the impacts. In fact, there were actually reduced impacts in a lot of areas. And another point that I wanted to bring up is that the agencies found that the bridge alternative actually had lower impacts in some areas than the alternative that the plaintiffs prefer, which is to upgrade the existing roads. The bridge had lower impacts on wetland fill, and it had lower impacts for natural upland areas. It also had lower impacts to housing in terms of noise and lower impacts for displacement of some of the important community features, like there's a mixed-use bike and pedestrian path that runs right along NC-12 that would have been impacted if the road was widened. So the agencies considered all these things. They took a comprehensive, hard look at it, and in the re-evaluation concluded that based on FHWA and CEQ regs, a supplement was not required. In the re-evaluation, the agencies also considered an additional alternative that was proposed by plaintiffs. Plaintiffs mentioned several times they don't think there was adequate public involvement. As part of the re-evaluation process, the agencies met with federal and state regulatory and environmental resource agencies, sought comment, asked them if they thought anything had changed, if there was updated information to consider. They also, plaintiffs received a draft copy of the re-evaluation documents, which they extensively commented on. They proposed an additional alternative. The agencies evaluated all those comments and considered them and responded to a lot of the points that the plaintiffs had raised in the re-evaluation document. Counsel, I hope you're the right person to ask. The re-evaluation study, is that a public document? What is its status as a public document? It is published when it's completed. In this case, the plaintiffs were given a copy because they frequently make public records requests and are provided with project planning documents throughout the planning process. But now it is a published public document. It is now a published document. All right. Anything else, Mr. Joses? No. If the court has no further questions, I would just ask that you reaffirm the district court. Thank you. All right. Thank you. Ms. Hunter, you've got some rebuttal time. Thank you, Your Honor. Just to that point on the re-evaluation, the entire problem for the plaintiffs in this case is the re-evaluation is not the same as a supplemental EIS. It's not public like a supplemental EIS is. It's not public prior to a decision being made, and it's not offered up for notice and comment. And just as a factual matter, when Mr. Justice notes that the plaintiffs in this case got a copy of it, this was a very early draft that we received, I think over a year before the ultimate re-evaluation was published. So, you know, us requesting the North Carolina Public Records Act is not a substitute for NEPA. And what the plaintiffs in this case wanted was that public democratic decision-making tool of the National Environmental Policy Act where we could review all of the information and comment on it and advocate with it before a final decision had been made. If I can return, I'll turn briefly to the question of the induced growth. And I just want to clarify that the plaintiff's concern here is not. Say that again. I just, I didn't understand what you said. The induced growth question. Our concern is not whether this process went backwards or forwards. The Federal Highway Administration can do its analysis in whatever way it wants to. Our concern is that because they did it backwards, what they then did was they just didn't impact, they didn't analyze the impact of the growth because it was a negative. And so, and we point this out in our brief repeatedly, they say, quote, no reasonable foreseeable induced development on the Outer Banks. That's at JA01909. No reasonable foreseeable induced development, JA01546. And these comments are made throughout the FEIS that there will be no induced growth and no impact of the bridge in an indirect way. And it's just really hard to square that with their statements elsewhere that there will be 800 additional acres and 2,400 additional units. And so our concern is not, they can do their analysis however they want to do it, but they need to do it in a way which discloses the impact and then analyzes the impact of that growth on the Outer Banks. And so while it's not exactly like the North Carolina wildlife case, we do believe they misled the public by saying time and time and time and time again, this bridge will have no induced development. And the reason they said that was because they had done their analysis in this backwards way. I thought there were several passages where they talked about 68 acres of development at the entrance to the bridge or something like that. There are, there is a sort of. Is that correct or incorrect? Well, that's on the mainland, Your Honor, not on the Outer Banks, first of all. And while there is somewhere this sort of backwards acknowledgement, I mean, my friend over here stated a few times it's very clear. It's not very clear. There is at one point an acknowledgement of this 800 acres. So is the development that would occur on the mainland side not relevant? Oh, that's relevant, but it doesn't absolve the agencies of their duty to analyze the impact on the Outer Banks. And I think we go through at length in our reply the places where they have pointed to where they said they did this analysis. And I think if you just take a look at the record, I mean, it's quite clear that they just didn't do it. And that's our concern. In the last couple of minutes, if I can talk again about the supplemental EIS standard, there is no court which has adopted, other than Judge Flanagan, which has adopted this idea that the alternatives analysis and the balancing of different environmental impacts of different alternatives is irrelevant to the SEIS inquiry. In fact, this court in Save Our Sound did that inquiry. It looked at the balance of alternatives. The case cited by my friend here speaks to that inquiry. It says, assuming that NEPA requires an SEIS where new information justifies reconsideration of a more environmentally favorable alternative, on this record, the situation didn't pass muster. But that test is the correct test. And the Ninth Circuit, the D.C. Circuit, the Fifth Circuit, this circuit have all made that inquiry. And that's because that's what NEPA is all about. NEPA is about helping make good decisions. Can I just go back to the question I asked you before, and I may not be framing it right, but I really was sort of combing your brief for the part where you would say, and that's why when you take this information into account, this other substantially less environmentally damaging alternative would be the obvious choice. I don't even understand what, are you suggesting that this information is significant, the traffic information and things like that are significant because it would have led the agency to choose the no-build alternative or the existing roads alternative? I don't even know. I just feel like half your argument hasn't been made here. Well, I think we didn't make that argument because NEPA is not a substantive statute. That might be more appropriate to make in a wetlands 404 case. But, yes, the agency is. But that's their entire argument. Right. So why are we even, why does it matter? Because as you say, NEPA is not a substantive statute. What it's for is disclosing the environmental impact of the bridge. And that hasn't changed except that it's become more modest. And what NEPA is for is it's the heart of the environmental impact statement, as the regulations say, is the alternatives analysis. And this bridge was selected because it was the only alternative that could solve these dire traffic needs. Since it's not in your brief, just tell me, in your view, this new information is environmentally relevant because it could have reasonably persuaded the agency to choose X alternative, which would be substantially less environmentally damaging. A variation on the existing roads alternative is the alternative that the plaintiffs submitted, yes. Okay, so if I think that in reading the original environmental impact statement, it's not clear to me that the agency, it seemed like it was a draw on environmental impact. There were things that were better for the environment about the existing roads alternative and things that were worse for the environment about the existing roads alternative. So what do I do with that? I think the crux of this matter is do we want to spend $600 million on a new bridge to the out of banks? And in 2012, the agency said, yes, because traffic's going to be so horrendous, because growth is coming so much, because it's the most cost effective thing to do, and because even though sea levels are rising, it's not going to interfere with this bridge. Now you fast forward seven years and every single one of those factors has changed. The traffic projections are half what they used to be. The financial situation is completely different. The sea level rise is coming at a much faster rate, which makes a new bridge to a barrier island a less good idea. And so you've got a completely new picture, and it's not just about whether you can persuade these agencies to do something, but NEPA's a tool for democratic decision making. And so in your perfect world, now instead they will do the existing road alternative, which has also negative environmental consequences, which seem to be sort of on a par with the consequences of the bridge. So I guess I'm still not understanding how you get to sort of the environmental relevance. We do not believe that the existing roads alternatives has the same environmental impact as the bridge, particularly because a lot of our clients are duck hunters. They spend a lot of time in the sound, and a whole new bridge through that sound is a very different question. If I can make one last point, Your Honor, even if you wanted to focus only on environmental concerns, the idea that sea level rise, which has changed so significantly, and for opposing counsel here to say, well, we just confirmed what we already knew, that sea level is rising, is kind of missing the point. Sea level is rising at a much, much faster rate than it was in 2012, and that absolutely has consequence for a decision about whether you build a new bridge, whether you spend $600 million of North Carolinians' money on a new bridge to a barrier island. And so that issue of sea level rise is something which should have been disclosed to the public, and the fact that the agencies looked at it somewhat themselves, but did not make that information public, is a violation of NEPA. And with that, I would ask you to vacate the record of decision. Thank you, Your Honor. Thank you very much. As you know from past practice, we would ordinarily come down and greet counsel in the well of court, but our COVID restrictions don't let us do that now. So we wish you the best, and thank you very much for your arguments, and I'll ask the clerk to adjourn court. The Honorable Court stands adjourned, sign die, God save the United States and the Honorable Court.
judges: G. Steven Agee, Albert Diaz, Pamela A. Harris